**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| GRETCHEN FRANCK, *on behalf of herself and all others similarly situated*,<br><br>     Plaintiff,<br><br>     v.<br><br>MARSHFIELD CLINIC, INC.,<br><br>     Defendant. | Case No.<br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Gretchen Franck, individually and on behalf of herself and all similarly situated persons, alleges the following against Marshfield Clinic, Inc. ("Marshfield Clinic" or "Defendant") based upon personal knowledge with respect to herself and on information and good faith belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

**INTRODUCTION**

1.      This class action lawsuit arises out of Defendant's unlawful use of third-party tracking technologies by data brokers such as Google LLC ("Google") to surreptitiously intercept and disclose their patients' and prospective patients' highly sensitive protected health information ("PHI") and personally identifiable information ("PII") to third parties without their informed consent.

2.      Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of such information can

have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.[1]

3.      Simply put, if people do not trust that their PHI will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

4.      Marshfield Clinic is one of the largest healthcare systems in Wisconsin with more than 60 clinic locations and 11 hospitals that serve over 300,000 patients annually.[2]

5.      By and through its website—https://www.marshfieldclinic.org/ (the "Website")— Marshfield Clinic's patients and potential patients can, among other things: (i) view information related to their medical conditions and potential treatments; (ii) search for and view information about treating physicians; (iii) search for clinic and hospital locations; (iv) book appointments; and (v) access patient resources, including patient forms and information related to billing, insurance, prescription refills, and financial assistance.

---

[1] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), https://thenextweb.com/news/facebook-is-receiving-sensitive-medical-information-from-hospital-websites, archived at https://perma.cc/95VY-9SZT (last visited Feb. 12, 2026); *see also* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/, archived at https://perma.cc/BZR8-XX4C (last visited Feb. 12, 2026).

[2] *See Locations*, https://www.marshfieldclinic.org/locations (last visited Feb. 7, 2026); Marshfield Clinic Fact Sheet, https://www.marshfieldclinic.org/education/ResidentsAndFellows/Documents/ClinicFacts_2020.pdf (last visited Feb. 7, 2026).

6.     Unfortunately, unbeknownst to Plaintiff and other visitors to and users of Marshfield Clinic's Website, their private personal and health information was not kept private.

7.     Instead, by placing, configuring, and using surveillance software ("Tracking Tools") on its Website, Defendant collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiff and other patients and prospective patients, including information related to specific medical conditions, treatments, physicians, treating locations, and patient resources such as billing, insurance, financial assistance and prescription refills (collectively, "Sensitive Health Information") to unauthorized third parties, including Google, through the use of surreptitious online tracking tools.

8.     As a result of Defendant's use of Google's Tracking Tools, Plaintiff's PHI and PII including, but not limited to, patient status, health conditions and symptoms, treatments, physicians, information related to appointments, billing, and insurance, and unique personal identifiers used to link the sensitive web communications to Plaintiff were compromised and disclosed to Google without authorization or consent.

9.     Defendant installed the Tracking Tools with the intent to collect and to disclose users' personal health information in violation of federal and state laws including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164) ("HIPAA").[3]

10.     Put another way, Defendant did not accidentally put trackers on its Website; rather, it partnered with third parties, *e.g.*, Google, to license the use of certain trackers, put those on the

---

[3] As detailed below, Defendant's violation of HIPAA is sufficient to show that the crime-tort exception of the Electronic Communications Privacy Act ("ECPA") applies. *See, e.g.*, *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025) ("A disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA. That's enough to conclude that the crime-tort exception applies.").

Website and configured those trackers to delineate the exact Sensitive Health Information it wanted to acquire (and to monetize) from its patients.

11.    Compounding those decisions and actions, Defendant could have informed its user base that it sought to acquire their valuable Sensitive Health Information in this manner but it made the conscious decision not to do so, all the while proclaiming that it has "long been committed to protecting patient privacy."[4]

12.    Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives like their healthcare. This information is then (often combined with other information) used as fuel for a massive, targeted advertising enterprise, among other nefarious purposes.

13.    Thus, any information about a person captured by these online behemoths can be used to serve targeted ads to that person, among other uses. If Google receives information that a person is suffering from or concerned about a particular medical condition, it will collect that information and allow its clients to use that information to serve ads related to treatments and services to that person's connected devices.

14.    Google offers its clients' website operators access to its proprietary suite of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools").

15.    Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted

---

[4] *Privacy Policy*, https://www.marshfieldclinic.org/about-us/privacy-policy (last visited Feb. 18, 2026).

advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

16.     In exchange for access to these Business Tools, website operators install Tracking Tools, including tracking pixels ("Pixels") and third-party cookies that capture sensitive, personally identifiable information provided to the website operator by its website users.

17.     This sensitive information can include a unique identifier that Google uses to identify that user called a Client ID ("CID"), regardless of what computer or phone is used to access the website.

18.     The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

19.     In essence, when website operators—such as Marshfield Clinic—use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.[5]

20.     Defendant is among the companies that have chosen to prioritize their marketing efforts and profits over the privacy of their patients and potential patients by installing Google's Tracking Tools on its Website.

21.     Plaintiff and Class Members used the Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools.

---

[5] Google warns that "HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies." *HIPAA and Google Analytics*, https://support.google.com/analytics/answer/13297105?hl=en#:~:text=Analytics%20customers%20are%20responsible%20for,that%20are%20not%20HIPAA%2Dcovered. (last visited Feb. 18, 2026).

22.    However, Defendant *never* obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties.

23.    At all times relevant to this action, Plaintiff and Class Members gave no informed consent for their Sensitive Health Information to be transmitted to third parties, including Google, the largest advertiser and compiler of user information.

24.    Health information is highly regulated by both state and federal law, including HIPAA, which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[6]

25.    Accordingly, Defendant's disclosure of Plaintiff's and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

26.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

27.    Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C.

---

[6] 18 U.S.C. § 1320d-(6).

§ 2511(1), *et seq*.; (ii) the Wisconsin Wiretap Statute, Wisconsin Statute § 968.31; (iii) Invasion of Privacy; (iv) Negligence; (v) Breach of Implied Contract; and (vi) Unjust Enrichment.

## PARTIES

28.    Plaintiff Gretchen Franck is, and at all relevant times hereto was, a resident of Wood County in the State of Wisconsin.

29.    Defendant Marshfield Clinic is a for-profit corporation incorporated in the State of Wisconsin with its principal place of business at 1000 N. Oak Avenue in Marshfield, Wisconsin, which is in Wood County.

30.    Marshfield Clinic operates approximately 60 clinics and 11 hospitals in Wisconsin and Michigan's Upper Peninsula.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

32.    Further, this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because the citizenship of at least one class member is different from Defendant.

33.    This Court has general personal jurisdiction over Defendant Marshfield Clinic because it is incorporated in the State of Wisconsin and maintains its principal place of business at 1000 N. Oak Avenue, Marshfield, Wisconsin.

34.     This Court has specific personal jurisdiction over Defendant Marshfield because it has availed itself of the rights and benefits of the State of Wisconsin, including by (i) providing services in this District; (ii) conducting substantial business in this District, including, but not limited to, business with Plaintiff; and (iii) perpetuating unlawful acts in this District.

35.     Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because a substantial part of the events giving rise to this action occurred in this District, including because Defendant collected and redistributed Class Members' Sensitive Health Information in this District; and Defendant caused harm to Class Members residing in this District, including Plaintiff.

## FACTUAL ALLEGATIONS

## A.      DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES.

### i.     GOOGLE'S MASS ADVERTISING SURVEILLANCE OPERATION.

36.     Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[7]

37.     In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[8]

---

[7] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively (last visited Feb. 12, 2026).

[8] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Feb. 12, 2026).

38.    Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[9]

39.    But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[10]

40.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[11]

41.    Google also admits that it uses the information collected from third-party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[12]

---

[9]    *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Feb. 12, 2026).

[10] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Feb. 12, 2026).

[11] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Feb. 12, 2026).

[12] *Id.*

42.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed.

43.     The vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of Google's surveillance network.

44.     Moreover, as Defendant did not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

45.     Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[13]

46.     With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[14]

47.     Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to

---

[13] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at* https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[14] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Feb. 12, 2026).

third-party tracking companies like Google,"[15] and Google trackers are present on 74-percent of all web traffic.

48.    Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a.    Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[16] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[17]

b.    81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[18]

---

[15] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Feb. 12, 2026).

[16] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Feb. 12, 2026).

[17] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Feb. 12, 2026).

[18] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at* https://pubmed.ncbi.nlm.nih.gov/31002321/.

    c.   93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[19] In fact, Google advertising trackers were found on 73-percent of pornography websites.[20]

49.    This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[21]

50.    In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[22]

51.    When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

52.    For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[23]

---

[19] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at* https://journals.sagepub.com/doi/10.1177/1461444820924632.

[20] *Id.*

[21] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Feb. 12, 2026).

[22] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Oct. 24, 2025) ("Google Analytics gives you the tools, free of charge").

[23] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Feb. 12, 2026).

53.     Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[24]

54.     And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[25]

55.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours—or 30.5 working days—to read the privacy policy of every new website that they visited in a single year.[26]

### ii.     PIXELS CAN RECORD ALMOST EVERY INTERACTION BETWEEN A USER AND A WEBSITE.

56.     In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto the Website.

57.     Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to

---

[24] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[25] *Id.*

[26] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[27]

58.    Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[28]

59.    But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[29]

---

[27] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Feb. 12, 2026).

[28] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Oct. 24, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Feb. 12, 2026).

[29] *Lurking Beneath the Surface, supra*, n. 25.

### iii. THE PIXELS INSTALLED ON THE WEBSITE TRANSMIT PERSONALLY IDENTIFIABLE INFORMATION AND PROTECTED HEALTH INFORMATION TO GOOGLE.

60.     Every website is hosted by a computer "server" that holds the website's contents.

61.     To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.

62.     Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

63.     Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses.

64.     A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information—the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

65.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as "cookies" on the user's device.[30]

66.     These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[31] For example, in a

---

[30] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Feb. 12, 2026).

[31] *Id.*

more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[32]

67.      When a Google user logs onto their account, their web browser records a Google tracking cookie.[33] This cookie includes a specific line of code that links the web browser to the user's Google account.[34]

68.      Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user.

69.      The information can include details about the user, his or her interactions with the website, and information about the user's environment (e.g., type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

70.      Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

71.      The Pixels then combine the data received from the browser with the data acquired from the cookie and instructs the web browser to transmit the information back to Google.

72.      As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile.

73.      Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

---

[32] *Id*.

[33] Cyphers, *supra*, n. 11.

[34] *Id*.

74.     A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[35]

75.     When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

76.     However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.[36]

77.     Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

78.     An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[37]

79.     By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[38]

---

[35] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Oct. 24, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Feb. 12, 2026).

[36] *See Client ID vs User ID in Google* Analytics, GLIDE AD AGENCY, https://glideagency.com/client-id-vs-user-id-in-google-analytics/ (last visited Feb. 12, 2026).

[37] Cyphers, *supra*, n. 11.

[38] *Id.*

80.     And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### iv. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO GOOGLE.

81.     Plaintiff and Class Members used the Website to (i) view information related to their medical conditions and potential treatments; (ii) search for and view information about treating physicians; (iii) search for clinic and hospital locations; (iv) book appointments; and (v) access patient resources, including patient forms and information related to billing, insurance, prescription refills, and financial assistance.

82.     Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google.

83.     The following screenshot ("Figure 1") depicts the network transmissions made by the Google Tracking Tools installed on the Website when Website users view information for Dr. Matthew J. Biller, MD, a psychiatrist at Marshfield Clinic.

84.     As Figure 1 shows, when users view information for a specific psychiatrist at Marshfield Clinic on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website includes confirmation that a specific user, made identifiable by his or her unique Client ID, searched for a psychiatrist and viewed information about this specific treating doctor at Marshfield Clinic, Dr. Matthew J. Biller, MD.



*Figure 1. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users view information related to Dr. Matthew J. Biller, MD, a psychiatrist at Marshfield Clinic. The Client ID has been redacted to preserve confidentiality.*

85.     The following screenshot ("Figure 2") depicts the network transmissions made by the Google Tracking Tools installed on the Website when patients view the Patient Resources information on Marshfield Clinic's Website, including information regarding billing, insurance and medical records.

86.     As Figure 2 shows, when patients view information related to billing, insurance, and medical records this Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website along with the user's unique Client ID.



| v | 2 |
|---|---|
| tid | G-MZ8GZXHC4S |
| gtm | 45je61r1v887275271za20gzb77439705zd77439705 |
| _p | 1769755659739 |
| gcd | 13I3I3I3I1I1 |
| npa | 0 |
| dma | 0 |
| cid | ███████████ |
| ul | en-us |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _geo | 1 |
| _rdi | 1 |
| _s | 5 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~115495940~115616986~115938465~115938468~116185181~116185182~116988315~117041588 |
| dl | https://www.marshfieldclinic.org/patient-resources |
| sid | 1769754284 |
| sct | 2 |
| seg | 1 |
| dr | https://www.marshfieldclinic.org/ |
| dt | Patient Resources: Billing, Insurance, Medical Records |
| en | user_engagement |
| _et | 4059 |

*Figure 2. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when patients view patient information related to billing, insurance, and medical records. The Client ID has been redacted to preserve confidentiality.*

21

87.     The following screenshot ("Figure 3") depicts the network transmissions made by the Google Tracking Tools installed on the Website when patients visit the page for prescription refills.

88.     As Figure 3 shows, when patients visit the page for prescription refills this Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website along with the user's unique Client ID.



| | |
|---|---|
| tid | G-MZ8GZXHC4S |
| gtm | 45je61r1v887275271z877439705za20gzb77439705zd77439705 |
| _p | 1769756074638 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | ██████████ |
| ul | en-us |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _geo | 1 |
| _rdi | 1 |
| _s | 1 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~115495938~115616985~115938465~115938468~116185181~116185182~116988316~117041588 |
| dl | https://www.marshfieldclinic.org/renewprescription |
| sid | 1769754284 |
| sct | 2 |
| seg | 1 |
| dr | https://www.marshfieldclinic.org/ |
| dt | Refill Prescription |
| en | page_view |
| tfd | 8760 |

*Figure 3. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when patients visit the page for prescription refills. The Client ID has been redacted to preserve confidentiality.*

89.     The information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff to her identity. As the screenshots above show, the Google Pixel on the Website transmitted the identifier numbers attached to Google's 'cid' cookie, which identifies the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

**B.     DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT.**

    **i.    DEFENDANT FAILED TO INFORM PLAINTIFF AND CLASS MEMBERS OF ITS DISCLOSURE OF THEIR SENSITIVE HEALTH INFORMATION, IN VIOLATION OF THEIR EXPRESS PROMISES.**

90.     Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google.

91.     Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant did not inform Plaintiff that it was sharing their Sensitive Health Information with third parties, including Google.

92.     By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

93.     Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

### ii. THE TRACKING TOOLS USED BY DEFENDANT WERE IMPERCEPTIBLE TO PLAINTIFF AND CLASS MEMBERS.

94.     The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Website.

95.     Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

96.     Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

97.     Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

## C.     DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

### i. DEFENDANT RECEIVED MATERIAL BENEFITS IN EXCHANGE FOR PLAINTIFF'S SENSITIVE HEALTH INFORMATION.

98.     As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its website.

99.     Upon information and good faith belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective

marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Health Information.

ii. **PLAINTIFF'S AND CLASS MEMBERS' DATA HAD FINANCIAL VALUE.**

100. Plaintiff's and Class Members' Sensitive Health Information has value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

101. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[39]

102. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

103. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[40] In fact, compared to other types of personal data, healthcare data records are by far

---

[39] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 12, 2026).

[40] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[41]

104.    Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

105.    The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

## D.    DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.

106.    The disclosure of Plaintiff's and Class Members' Sensitive Health Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Sensitive Health Information.[42]

107.    The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes

---

[41] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

[42] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Feb. 12, 2026).

PHI.[43]

108.    While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

109.    Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply *not* permitted to use tracking technology tools in a way that exposes Sensitive Health Information to any third party without express and informed consent.

110.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[44]

111.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

112.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an

---

[43]    *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html    (last visited Feb. 12, 2026) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

[44]    HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

113.    Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

114.    The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers like Defendant—to maintain appropriate safeguards to protect the privacy of PHI and set limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

115.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI.

116.    The U.S. Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information

was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[45]

117.    Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[46]

118.    Here, Defendant provided PHI to third parties in violation of the Privacy Rule.

119.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

120.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in

---

[45]    *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Feb. 12, 2026).

[46]    *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Feb. 12, 2026).

violation of 45 C.F.R. § 164.306(a)(1);

b.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

c.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

d.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to IIHI in violation of 45 C.F.R. § 164.306(a)(3);

e.    Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

f.    Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

121.    In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[47]

---

[47] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

122.    In its Guidance regarding Marketing, HHS further instructed in 2003:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[48]

123.    HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

a.    "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.    "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c.    It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

124.    In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Tracking Technologies. Courts, including in this Circuit, have found the same under near-identical circumstances.[49]

---

[48] *Marketing*, HHS, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003) (last visited Feb. 12, 2026).

[49] *See, e.g.*, *Edward-Elmhurst Health*, 2025 WL 580556, at *6; *see also id.*, at *5 ("Courts from coast to coast have recognized that violation of HIPAA can give rise toa the crime-tort exception under the ECPA.") (collecting cases).

E.      **PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.**

125.    At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

126.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

127.    For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[50]

128.    Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[51]

---

[50] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Feb. 12, 2026).

[51] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

129.    And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[52]

130.    Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

### TOLLING AND ESTOPPEL

131.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

132.    The Tracking Tools on the Website were and are invisible to the average website visitor.

133.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

134.    Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

135.    Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients and potential patients, including Plaintiff and Class Members, that by (i) viewing information related to their medical conditions and potential treatments; (ii) searching for and view information about treating physicians; (iii) searching for clinic and hospital locations; (iv) booking appointments; and (v) accessing patient resources, including patient forms and information related to billing, insurance, prescription refills,

---

[52] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

and financial assistance, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

136.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' and potential patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients or potential patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

137.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

138.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCE

139.    Plaintiff accessed and used the Website through her computer and mobile devices while located in Wisconsin to seek medical treatment from August 2011 until February 2026.

140.    Plaintiff used the Website to, among other things, view information related to her medical conditions and treatments, including fibromyalgia, rheumatoid arthritis, autoimmune disease, porphyria disease, and inflammatory arthritis, view information related to her treating physicians, hospital and clinic locations, pay bills, and manage prescription refills.

141.    Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that she communicated while using the Website.

142.     Plaintiff never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

143.     On every occasion that she visited the Website, Plaintiff possessed an account with Google, and she accessed the Website while logged into her Google account on the same device.

144.     After providing her Sensitive Health Information to Defendant through the Website, Plaintiff immediately began seeing targeted online advertisements for medical services and products, including advertisements related to arthritis.

145.     Plaintiff reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by any third party without her full knowledge and informed consent.

146.     Plaintiff provided her PHI and PII to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

147.     As described herein, Defendant worked along with Google to intercept Plaintiff's communications, including those that contained confidential PHI and PII.

148.     Defendant willfully facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

149.     The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to third party data brokers can only be determined through formal discovery. However, Defendant intercepted at least communications about Plaintiff's past or present medical conditions and treatments sought, which were sent to Google.

150.    By doing so without his consent, Defendant breached Plaintiff's right to privacy and unlawfully disclosed her Sensitive Health Information.

151.    Defendant did not inform Plaintiff that it shared her Sensitive Health Information with Google.

152.    Plaintiff suffered damages in, *inter alia*, the form of (i) violation of confidentiality of his PHI and PII; (ii) loss of benefit of the bargain; (iii) diminution of value of her PHI and PII; (iv) statutory damages; and (v) the continued and ongoing risk of her PHI and PII.

153.    Plaintiff has a continuing interest in ensuring that her PHI and PII is protected and safeguarded from future unauthorized disclosure. Plaintiff wants to continue to communicate through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Google and thus continues to be at risk of harm from Defendant's conduct.

## CLASS ALLEGATIONS

154.    This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

155.    The Nationwide Class that Plaintiff seeks to represent is defined as:

> All natural persons who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

156.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of the following Wisconsin Subclass:

> All natural persons residing in the State of Wisconsin who used the
> Website, and whose Sensitive Health Information was disclosed or
> transmitted to Google or any other unauthorized third party.

157.    Excluded from the proposed Class are any claims for personal injury, wrongful

death, or other property damage sustained by the Class; and any Judge conducting any proceeding

in this action and members of their immediate families.

158.    Plaintiff reserves the right to amend the definitions of the Class or add subclasses

if further information and discovery indicate that the definitions of the Class should be narrowed,

expanded, or otherwise modified.

159.    **Numerosity.** The Class is so numerous that the individual joinder of all members

is impracticable. As one of the largest healthcare systems in Wisconsin with approximately 60

clinics and 11 hospitals, at least 100—and likely many more—patients and other Website users

have been impacted by Defendant's actions. Moreover, the exact number of those impacted is

generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

160.    **Commonality.** Common questions of law or fact arising from Defendant's conduct

exist as to all members of the Class, which predominate over any questions affecting only

individual Class Members. These common questions include, but are not limited to, the following:

a.    Whether and to what extent Defendant had a duty to protect the Sensitive
Health Information of Plaintiff and Class Members;

b.    Whether Defendant had duties not to disclose the Sensitive Health
Information of Plaintiff and Class Members to unauthorized third parties;

c.    Whether Defendant adequately, promptly, and accurately informed
Plaintiff and Class Members that their Sensitive Health Information
would be disclosed to third parties;

d.    Whether Defendant violated the law by failing to promptly notify Plaintiff
and Class Members that their Sensitive Health Information was being
disclosed without their consent;

e.     Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' and potential patients' Sensitive Health Information;

f.     Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g.     Whether Defendant violated the statutes asserted as claims in this Complaint;

h.     Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i.     Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy practices; and

j.     Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

161.    **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

162.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights, and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

163.    **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over

any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

164.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

165.     Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

166.     Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

    b.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f.    Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

167.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names of each Class Members affected by the unauthorized disclosures that have taken place.

## COUNT I

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1), *et seq.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff & the Nationwide Class)***

168.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

169.    The ECPA protects both sending and receipt of communications.

170.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

171.    The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

172.    <u>Electronic Communications</u>. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

173.    <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

174.    <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

175.    <u>Electronic, Mechanical, or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiff's and Class Members' browsers;

b.    Plaintiff's and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient and Website user communications.

176.    By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to

intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

177.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Health Information to third parties such as Google.

178.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including information related to their medical conditions and potential treatments, treating physicians, and appointments.

179.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

180.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

181.    <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

182. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

183. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

184. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

   a.    Invasion of privacy;

   b.    Breach of confidence;

   c.    Breach of fiduciary duty;

   d.    Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

185. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

186. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Health Information with Google and other third-parties that did not participate in these communications, that Plaintiff

and Class Members did not know were receiving their Sensitive Health Information, and that

Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

187.    As such, Defendant cannot viably claim any exception to ECPA liability.

188.    Plaintiff and Class Members have suffered damages as a direct and proximate result

of Defendant's invasion of privacy in that:

    a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

    b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

    c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

    d.    Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

    e.    The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

189.    Defendant intentionally used the wire or electronic communications to increase

their profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's

and Class Members' Sensitive Health Information for financial gain.

190.    Defendant was not acting under color of law to intercept Plaintiff's and Class

Members' wire or electronic communication.

191.    Plaintiff and Class Members did not authorize Defendant to acquire the content of

their communications for purposes of invading their privacy via the Pixels.

192.    Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

193.    In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

194.    As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT II

### VIOLATIONS OF THE WISCONSIN WIRETAP STATUTE
### Wis. Stat. § 968.31
### *(On Behalf of Plaintiff & the Nationwide Class or, alternatively, the Wisconsin Subclass)*

195.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

196.    Wisconsin Statute § 968.31 prohibits the interception and disclosure of wire, electronic, or oral communications. Specifically, any person who does any of the following acts violates Section 968.31(1):

    a.    "Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication."

    b.    "Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication."

    c.    "Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting

violation of this section."

d.  "Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

197.    Wisconsin Statute § 968.31(2m) provides a private right of action to any person whose wire, electronic or oral communications are intercepted, disclosed, or used in violation of Wisconsin Statute § 968.31(1).

198.    The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "electronic communications" under Wisconsin Statute § 968.27.

199.    <u>Electronic Communications</u>. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature . . . transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system" and are therefore "electronic communications" within the meaning of Wisconsin Statute § 968.27(4).

200.    <u>Content</u>. Wisconsin Statute § 968.27(3) defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." Wis. Stat. § 968.27(3).

201.    <u>Interception</u>. Wisconsin Statute § 968.27(9) defines "interception" as the "acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." Wis. Stat. § 968.27(9).

202.    <u>Electronic, Mechanical, or Other Device</u>. Wisconsin Statute § 968.27(7) defines "electronic, mechanical or other device" as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" Wis. Stat. § 968.27(7). The following constitute "devices" within

the meaning of Wis. Stat. § 968.27(7):

      a.    Plaintiff's and Class Members' browsers;

      b.    Plaintiff's and Class Members' computing devices;

      c.    Defendant's web-servers; and

      d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient and Website user communications.

203. By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of Wisconsin Statute § 968.31(1)(a).

204. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Health Information to third parties such as Google.

205. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including information related to their medical conditions and potential treatments, treating physicians, and appointments.

206. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of Wisconsin Statute § 968.31(1)(a), Defendant violated Wisconsin Statute § 968.31(1)(d).

207. <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of

Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

208.    Wisconsin Statute § 968.31 provides that a "party to the communication" may be liable where "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the constitution or laws of the United States or of any state for the purpose of committing any other injurious act." Wis. Stat. § 968.27(2)(c).

209.    Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

210.    Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.    Invasion of privacy;

    b.    Breach of confident;

    c.    Breach of fiduciary duty;

    d.    Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

    e.    Violation of HIPAA, 42 U.S.C. § 1320d-6 in that they used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

211.    Defendant is not exempt from liability under Wisconsin Statute § 968.31on the

ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used their participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Health Information with Google and other third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

212.    As such, Defendant cannot viably claim any exception to liability under Wisconsin Statute § 968.31.

213.    Plaintiff and Class members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

    b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

    c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

    d.    Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

    e.    The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

214.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and

Class Members' Sensitive Health Information for financial gain.

215.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

216.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

217.    Any purported consent that Defendant may claim they received from Plaintiff and Class Members was not valid.

218.    In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

219.    As a result of Defendant's violation of Wisconsin Statute § 968.31, Plaintiff and the Class are entitled to all damages available under, including statutory damages of whichever is the greater of $100 a day for each day of violation or $1,000, punitive damages, and attorney's fees and costs.

## COUNT III

### COMMON LAW INVASION OF PRIVACY
*(On Behalf of Plaintiff & the Nationwide Class or, alternatively, the Wisconsin Subclass)*

220.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

221.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites

without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

222.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

223.    Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

224.    Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

225.    Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

226.    Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

227.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

228.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

229.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm

to their privacy interests as a result of the intrusions upon their privacy.

230.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

231.    Plaintiff also seek such other relief as the Court may deem just and proper.

## COUNT IV

### NEGLIGENCE
### *(On Behalf of Plaintiff & the Nationwide Class or, alternatively, the Wisconsin Subclass)*

232.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

233.    Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

234.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

235.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

236.    Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

237.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

238. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

239. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

240. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT V

### BREACH OF IMPLIED CONTRACT
*(On Behalf of Plaintiff & the Nationwide Class or, alternatively, the Wisconsin Subclass)*

241. Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

242. When Plaintiff and Class Members provided their Sensitive Health Information to Defendant in exchange for medical services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

243. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

244. Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant

obligating Defendant to not disclose Sensitive Health Information without consent.

245. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like Google.

246. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

247. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

248. Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

<u>**COUNT VI**</u>

**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff & the Nationwide Class or, alternatively, the Wisconsin Subclass)***

249. Plaintiff repeats and realleges each and every allegation contained in the Complaint as if fully set forth herein.

250. Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

251. Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant, which Defendant then utilized for marketing and advertising purposes, as described herein.

252. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

253. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's

and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

254.    Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' and potential patients' Sensitive Health Information.

255.    Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

256.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

257.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

258.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

259.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all other Class Members, prays for judgment against Defendant as follows:

A.    an Order certifying the Nationwide Class and the Wisconsin Subclass, and appointing the Plaintiff and their Counsel to represent the Classes;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C.    injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.    an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded; and

G.    all such other and further relief as this Court may deem just and proper.

Dated: February 18, 2026                    Respectfully submitted,

                                            */s/ David S. Almeida*

                                            David S. Almeida (WI Bar # 1086050)
                                            Christopher M. Nienhaus (WI Bar # 1097650)
                                            **ALMEIDA LAW GROUP LLC**
                                            849 W. Webster Ave.
                                            Chicago, Illinois 60614
                                            Tel.: (708) 529-5418
                                            david@almeidalawgroup.com
                                            chris@almeidalawgroup.com

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: February 18, 2026

Respectfully submitted,

*/s/ David S. Almeida*
David S. Almeida